FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* AUGUST 08, 2024 *
BROOKLYN OFFICE

JPL:MRG/DR/EL
F. #2021R00923

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ELIAHOU PALDIEL and
CARLOS ARTURO SUAREZ PALACIOS,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N D I C T M E N T

Cr. No. _____24-CR-329_____
(T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1),
982(b)(1), 1349, 1956(h), 2 and 3551 et
seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

**Judge Allyne R. Ross**
**Magistrate Judge Vera M. Scanlon**

THE GRAND JURY CHARGES:

### INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendants and Relevant Entity</u>

        1.    The defendant ELIAHOU PALDIEL was a citizen of the United States and resident of Queens, New York and elsewhere.

        2.    The defendant CARLOS ARTURO SUAREZ PALACIOS ("SUAREZ") was a citizen of the United States and resident of New Jersey.

        3.    Rideshare Company-1, an entity the identity of which is known to the Grand Jury, was a multinational company headquartered in the United States, that provides ridesharing services, among other services. It operates primarily through its smartphone application, connecting users with drivers for on-demand transportation and delivery services.

Case 1:24-cr-00329-ARR Document 1 Filed 08/08/24 Page 2 of 14 PageID #: 18

2

II.     Relevant Background Regarding Rideshare Services

4.      Rideshare services, also known as ride-hailing or transportation network services, are platforms that connect customers with drivers for on-demand transportation. The customers, or users of the application, request rides through smartphone applications on their cellular devices, which triggers a chain of events meant to result in a driver being dispatched to pick up the user for transport to the user's selected destination.

5.      Prospective Rideshare Company-1 riders typically download a smartphone application to use the service (the "Rideshare Application"). To order a ride, the prospective rider can open the Rideshare Application, specify pick-up and drop-off locations, and request a ride. Prior to requesting a ride, the user is presented with an approximate fare for the requested trip.

6.      Thereafter, the Rideshare Application sends the ride request to a nearby Rideshare Company-1 driver who is notified of the prospective ride through the driver's Rideshare Application. The Rideshare Company-1 driver then elects to either accept or decline the prospective ride. If the Rideshare Company-1 driver rejects the prospective ride, the ride is offered to another nearby driver until the ride is accepted or expires.

7.      The precise information a driver is provided prior to deciding whether to accept or decline varies by region. A feature of Rideshare Company-1's service in the New York City area, among other regions, is that drivers do not receive certain information concerning the prospective ride—including the approximate ride fare or the user's destination address—until after the driver accepts the ride. Prior to accepting the ride, the driver only has limited information about the prospective ride, such as the passenger rating, pick-up location, the

general cardinal direction of the passenger's destination, and the "surge" amount (described below), if any, associated with the ride.

8. If a Rideshare Company-1 driver accepts a prospective ride, the driver navigates to the user's location for pickup and transports the user to their destination. Typically, during this entire period, from initiation of the ride by the user, dispatch to the prospective driver, to completion of the ride, the Rideshare Application provides real-time global positioning system ("GPS") or location tracking of the driver, rider and trip. Payment is handled electronically through the Rideshare Application.

9. Rideshare Company-1 drivers picking up passengers from airports and large events, such as concerts, may be required to "queue" in order to receive prospective rides, which are distributed in the order in which the drivers arrive in the vicinity of the airport or event.

10. Rideshare Company-1 calculates ride fares based on a variety of factors including distance, time of day and demand, which may include increased fare prices during periods of high rider demand. Fares may increase—or "surge"—when demand for Rideshare Company-1 rides increase in certain geographic locations, resulting in a shortage of Rideshare Company-1 drivers available in that area to service prospective riders. To temper demand and encourage drivers to service high-demand areas, Rideshare Company-1 implements a surge fare incentive to Rideshare Company-1 drivers who agree to pick up riders in the "surging" areas and actually do so. Through the Rideshare Application, Rideshare Company-1 drivers can see whether a geographic area has surging prices. Price surges are typically noted in both the prospective rider's and driver's Rideshare Application. To take advantage of surge pricing, the prospective driver must be in, or travel to, the particular surge area.

4

11.     The Rideshare Application relies on, among other things, GPS to determine the locations of riders and drivers.  GPS is a network of satellites that, through the transmission of radio frequency signals to GPS receivers found in devices such as cellular telephones, provides location data to such GPS receivers.  Accordingly, Rideshare Company-1 depends on its drivers' and users' accurate GPS location data to efficiently pair prospective riders with Rideshare Company drivers, to assist Rideshare Company drivers in navigating riders to their destinations and accurately calculate fares, including the calculation of fare price surges, and to estimate user pick-up and drop-off times.  GPS location data is also used for safety purposes.

III.    The Rideshare Scheme

   A.    Overview

12.     From at least in or about November 2018 through July 2024, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS, together with others, engaged in a scheme to defraud Rideshare Company-1's users and drivers by, among other things: (a) causing riders to pay millions of dollars in fraudulent "surge" fees to hundreds of participating Rideshare Companies' drivers (the "Driver Co-conspirators"); and (b) depriving legitimate Rideshare Company-1 drivers of their true share of "surge" fares and most valuable trips.

   B.    The Scheme Devices and Scheme Applications

13.     It was part of the scheme that the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS, together with others, for profit, developed, installed and configured on Driver Co-conspirators' cellular devices certain applications (the "Scheme Applications") that enabled Driver Co-conspirators to, among other things: (a) manipulate—or

"spoof"—the drivers' GPS location in the Rideshare Application, thereby allowing the drivers to (i) fraudulently obtain "surge" fares to which they were not entitled, and (ii) "queue" in areas where the driver was not physically present; and (b) cherry-pick high-fare rides by gaining access to information about prospective rides that was unavailable to Rideshare Company-1 drivers behaving lawfully.

14. The defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS typically sold the Scheme Applications to Driver Co-conspirators on manipulated—also known as "jailbroken" or "rooted"—cellular devices (the "Scheme Devices"). A jailbroken or rooted cellular device was a device that had its operating system security restrictions modified or removed, thereby allowing the installation of software, including applications, that the device manufacturer had not made available for the device. Driver Co-conspirators also utilized the Rideshare Application on their Scheme Devices.

15. In furtherance of the scheme, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS provided Driver Co-conspirators with the following suite of Scheme Applications which were otherwise not publicly available and were not approved by Rideshare Company-1:

    (a) <u>Fake GPS</u> – "Fake GPS" was a GPS spoofing application developed by PALDIEL, SUAREZ and others. Fake GPS enabled Driver Co-conspirators to, among other things, manipulate or "spoof" their locations within the Rideshare Application and make it appear as if they were located in an area with surging fares when, in fact, they were not. In turn, Driver Co-conspirators were able to fraudulently obtain surge pricing increases on rides to and from locations that were not actually "surging." Fake GPS also enabled Driver Co-conspirators to place themselves in airport and event "queues" prior to the Driver Co-

conspirators' arrival at the actual location, thereby reducing the time that the driver had to wait in the queue, i.e., "cutting" the line ahead of legitimately operating drivers.

(b)  Screwber – Screwber was an application developed by PALDIEL, SUAREZ and others that provided Driver Co-conspirators with information about prospective Rideshare Company-1 rides that was not otherwise available to Rideshare Company-1 drivers prior to accepting such rides.  For example, Screwber enabled Driver Co-conspirators to obtain prospective riders' destinations and approximate fares for prospective trips, thereby allowing Driver Co-conspirators to accept or decline the prospective rides based on information to which they were otherwise not entitled and, in turn, cherry-pick only the most profitable and lucrative rides offered to them through the Rideshare Application.

(c)  Outdated Rideshare Application – Outdated versions of the Rideshare Application were downloaded onto the Scheme Devices provided to Driver Co-conspirators.  By installing outdated versions of the Rideshare Application, PALDIEL and SUAREZ ensured that the Fake GPS and Screwber applications were not detected by security features implemented in newer versions of the Rideshare Application.

16.  In addition to installing the Scheme Applications on the Scheme Devices, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS also installed, and caused the installation of, a push-notification messaging application on Driver Co-conspirators' personal devices to communicate with Driver Co-conspirators about the scheme (the "Push-notification Application").  For example, PALDIEL used the Push-notification Application to send Screwber information to Driver Co-conspirators simultaneously to their receipt of a prospective ride through the Rideshare Application.

17. The defendant ELIAHOU PALDIEL also utilized the Push-notification Application to provide updates to Driver Co-conspirators about the Scheme Applications, including information about application functionality and how the drivers should use the Scheme Applications to avoid detection by Rideshare Company-1. For example:

(a) On or about April 6, 2024, a message was pushed out to the Driver Co-conspirators via the Push-notification Application that stated:

> ***Warning*** Using 2 iphones with FakeGPS is very very risky. If you need FakeGPS for airport I recommend doing it one time a day. Do it when you wake up in the morning before you go to the airport. Do not do it more than one time a day. If you are not sure then please do not use FakeGPS and never take a selfie if you are using FakeGPS.

(b) On or about June 26, 2024, PALDIEL sent a notice to drivers in English and Georgian via the Push-notification Application stating that Driver Co-conspirators could meet PALDIEL at his residence on specified dates to seek PALDIEL's assistance with Scheme Devices. At one or more of these specified dates and times, over 20 vehicles met with PALDIEL outside of his residence.

18. In furtherance of the scheme and in order to conceal it, the defendant CARLOS ARTURO SUAREZ PALACIOS, together with the defendant ELIAHOU PALDIEL, paid Hosting Provider-1, an entity the identity of which is known to the Grand Jury, for a subscription to private cloud servers that PALDIEL and SUAREZ used to support their Scheme Applications. To conceal from Rideshare Company-1 the Driver Co-conspirators' use of the Scheme Devices and Scheme Applications, PALDIEL and SUAREZ configured, and caused to be configured, the Scheme Devices to access the Rideshare Application using internet protocol ("IP") addresses assigned by and routed through the Hosting Provider-1 cloud servers. In one

instance, for example, PALDIEL and SUAREZ discussed deploying a "weekly rotation of I[P]s" to avoid detection of the scheme by Rideshare Company-1.

19. Use of the Scheme Devices, Scheme Applications, Push-notification Application, Hosting Provider-1 service and other means, violated, and caused the Driver Co-conspirators to violate, Rideshare Company-1's terms of service, and fraudulently interfered with Rideshare Company-1's business operations by, among other things, impairing the effectiveness of its computer algorithms and its ability to effectively pair riders with drivers.

C. Sales of Scheme Devices and Applications to Driver Co-conspirators

20. The defendant ELIAHOU PALDIEL typically sold and facilitated the sale of the Scheme Devices equipped with the Scheme Applications from the vicinity of his residence in Queens, New York. PALDIEL charged Driver Co-conspirators approximately $600 per Fraudulent Device equipped with the Scheme Applications, plus a $300 monthly subscription for continued use of the Screwber and Push-notification Applications and a $50 one-time fee for the Fake GPS application.

21. The defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS discussed, via electronic messaging, their strategy to profit from the Driver Co-conspirators. For example, on or about November 2, 2018, SUAREZ wrote to PALDIEL, "You know Screwber is like drugs .. once you get into it you'll get withdrawals when you can't get your fix 😈." As part of the same message chain, on or about November 21, 2018, PALDIEL wrote to SUAREZ regarding the Driver Co-conspirators: "I get them hooked on the software, even a drug deal[er] throws in a few extra grams of weed in the beginning." PALDIEL and SUAREZ also discussed, via electronic messaging, various other aspects of the scheme including

payments received from Driver Co-conspirators who purchased and subscribed to the Scheme Applications, and functionality issues of the Scheme Applications.

22. As part of the scheme, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS sold and supplied, and caused the sale and supply of, Scheme Applications to more than approximately 800 Driver Co-conspirators.

D. The Defendants' Laundering and Concealment of Scheme Profits and Proceeds

23. To promote the scheme and conceal the proceeds derived from it, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS shared profits obtained through the scheme, including, for example, from the monthly subscription fee charged to Driver Co-conspirators for their use of and access to Screwber.

24. From in or about and between December 2019 and September 2023, the defendant ELIAHOU PALDIEL received approximately $1.5 million, via a digital payment network, from Driver Co-conspirators. In turn, PALDIEL, from in or about and between approximately February 2020 and December 2023, sent the defendant CARLOS ARTURO SUAREZ PALACIOS more than approximately $733,000 from another digital payment account operated by PALDIEL. PALDIEL input scheme-related descriptions in the payment memos for these transactions, including "monthly screwber" and "server," among others.

25. In electronic messages to one another, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS discussed ways to hide their criminal proceeds. For example, on or about March 8, 2021, SUAREZ wrote to PALDIEL, "we have to find how to hide this money better lol" to avoid paying taxes on their criminal proceeds.

26. To further promote the scheme, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS also split costs of operating expenses including the

Case 1:24-cr-00329-ARR   Document 1   Filed 08/08/24   Page 10 of 14 PageID #: 26

10

subscription fees paid to Hosting Provider-1. In or about and between March 2019 and November 2023, SUAREZ made a series of payments to Hosting Provider-1 totaling approximately $25,000. Between at least in or about and between February 2020 and October 2023, PALDIEL reimbursed SUAREZ for approximately half of those costs of maintaining Hosting Provider-1's servers.

27. PALDIEL received criminal proceeds in an account he owned and operated. Further, he engaged in several financial transactions of more than $10,000 using these crime proceeds, including transmitting funds to brokerage accounts he controlled and making mortgage payments.

28. SUAREZ received criminal proceeds in an account he owned and operated. Further, he engaged in several financial transactions of more than $10,000 using these crime proceeds, including to pay off his credit card and make mortgage payments.

29. Between approximately January 2020 and June 2024, as a result of the scheme perpetrated by the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS, Driver Co-conspirators using Scheme Devices received fares of over approximately $40,000,000 in rides with Rideshare Company-1 customers.

COUNT ONE
(Conspiracy to Commit Wire Fraud)

30. The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

31. In or about and between November 2018 and August 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud

Rideshare Company-1, and Rideshare Company-1's drivers and riders, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Money Laundering Conspiracy)

32. The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

33. In or about and between May 2019 and August 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ELIAHOU PALDIEL and CARLOS ARTURO SUAREZ PALACIOS, together with others, did knowingly and intentionally conspire:

(a) to conduct one or more financial transactions in and affecting interstate and foreign commerce, which transactions in fact involved the proceeds of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the monetary instruments and funds involved in the transactions represented the proceeds of some form of unlawful activity, (i) with the intent to promote the carrying on of such specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i), and (ii) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of such specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b) to engage in one or more monetary transactions within the United States involving criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

34. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

35. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

36.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

37.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

14

property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

/s/

FOREPERSON

*By Carolyn Pokorny, Assistant U.S. Attorney*

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK